IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | Criminal Case **3:19-CR-623-L** |
| | § | |
| **MICHAEL TREMAINE** | § | |
| **SCHEXNAYDER** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the court is Defendant's Motion to Suppress ("Motion") (Doc. 68), filed January 12, 2021, which includes a request for an evidentiary hearing. The court necessarily granted Defendant's request for a hearing, over the Government's opposition, by scheduling and conducting an evidentiary hearing on May 6, 2021. After considering the Motion, the Government's response in opposition, applicable law, and the arguments and evidence presented by the parties during the evidentiary hearing, including documentary evidence and witness testimony, the court **denies** Defendant's Motion (Doc. 68) with respect to his request to suppress evidence that was seized on July 16, 2019, after his arrest; statements that were made by him immediately after he was taken into custody and arrested on July 16, 2019; and evidence regarding the photo lineup identification of him on October 4, 2019, by a witness to the armed robbery.

**I.     Defendant's Motion to Suppress**

Michael Tremaine Schexnayder ("Defendant" or "Mr. Schexnayder"), who is proceeding pro se, moves to suppress evidence of unspecified materials removed from his pants pockets by police officers during his arrest on July 16, 2019, on the grounds that the arresting officers lacked probable cause for the search and seizure of "illegal[ly] obtained evidence" described in the affidavit of Special Agent Scott C. Satcher ("Agent Satcher"), and that the search and seizure violated the Fourth Amendment to the United States Constitution, his right to due process, and his

expectation of privacy in his pants pockets under *Katz v. United States*, 389 U.S. 347 (1967). Defendant asserts that "he was not running or hiding from police prior to arrest" and he "denies that assertion by [the] police." Def.'s Mot. 2. In addition, he contends that "proper *Miranda* warnings were not given to him by the police and proper waiver of those rights did not occur.[1] *Id.* (citing *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant requests that the court "suppress evidence according to the law" after conducting a hearing. Def.'s Mot. 3.

## II. The Government's Response in Opposition to the Motion

The Government's response focuses on Defendant's contention that law enforcement lacked probable cause to arrest him and search his person. In this regard, the Government contends that Defendant's "collection of conjectural and conclusory assertions" is insufficient to warrant an evidentiary hearing, and, regardless, the police had probable cause to arrest him and authority to search his person incident to his lawful arrest for armed robbery and vehicular flight:

> At about 11:00 a.m. on July 16, 2019, Schexnayder—. . . wearing a blue shirt, blue shorts, blue shoes, and a white hat printed with marijuana leaves—entered the T-Mobile cellular telephone store located on South Carrier Parkway in Grand Prairie, Texas. He initially interacted with a store employee and pretended to be a T-Mobile customer, but he pulled out a concealed pistol and forced employees and customers into a backroom. He then took personal property from the victims and money and merchandise from the store at gunpoint. He also took the store manager's car keys and iPhone and fled the store in her car with his take.
>
> . . .
>
> The police responded to the armed robbery. Using the "Find My iPhone" feature on the store manager's stolen phone, the police located and tracked the stolen car travelling westbound on I-20 toward Fort Worth. The police intercepted the car and Schexnayder then led them on a high-speed chase that ended at a Fort Worth motel. Driving into the motel parking lot with police cars in hot pursuit, Schexnayder—still outfitted in his vivid robbery apparel—jumped out from behind the wheel of the moving car and fled on foot into a nearby wooded area. The

---

[1] Defendant also asserts that the police officers who arrested him did not have jurisdiction over him. No factual or legal explanation is provided for this assertion, which appears to be similar to the jurisdictional arguments that Defendant has previously asserted and the court has rejected a number of times in this case in various orders and hearings. Accordingly, relief on this ground is not warranted and is **denied**.

**Memorandum Opinion and Order – Page 2**

> unoccupied car containing evidence of the robbery—minus Schexnayder's pistol—stopped after crashing into a safety barrier.
>
> The police quickly apprehended Schexnayder hiding near a shed. He was unarmed when arrested, but the police later found his loaded .40 caliber pistol hidden underneath a woodpile next to the shed. Unaware that the police had found the weapon, Schexnayder placed a recorded jail call to an acquaintance and gave specific directions where "The Big Child" could be retrieved, instructing that the gun was hidden under the woodpile by the shed.

Gov't Resp. 2-3.

The Government contends that these facts establish the needed probable cause for Defendant's arrest and provided the arresting police officers with authority to search his person without a warrant "because they caught him *in flagrante delicto*, that is, in blazing offense":

> The police responded to the armed robbery and located Schexnayder in the store manager's car using her iPhone that he also took. The police intercepted Schexnayder driving the stolen car and attempted to stop him, but he engaged the police in a dangerous car-chase. He eventually jumped out the car and fled on foot wearing the very apparel that he wore during the robbery. The police then found him hiding nearby and arrested him. Because the police lawfully arrested Schexnayder for armed robbery and vehicular flight, the search of his person was proper. *See, e.g., United States v. Campbell*, 575 F.2d 505, 507 (5th Cir. 1978) ("[D]efendants were lawfully arrested. The search of Mosley's jacket and seizure of the incriminating piece of paper were clearly proper.").

Gov't Resp. 5. The Government, therefore, contends that the arrest and search were lawful, and Defendant's Motion to Suppress should be denied.

### III. Discussion

As noted, the court conducted an evidentiary hearing on Defendant's Motion to Suppress on May 6, 2021. During this hearing, both parties were given the opportunity to present additional arguments and evidence in support of their respective positions. Grand Prairie Major Crimes Detective Zach Miles testified on behalf of the Government. The Government also played the police videos of law enforcement's pursuit and arrest of Defendant. Gov't Exs.1-2. In response to a new argument raised by Defendant for the first time during the hearing, the Government, at

Defendant's request, also presented the color version of the photo lineup administered by Agent Satcher and the admonition signed by T-Mobile store manager Ruby Garcia, who was a witness to the robbery. Based on the parties' evidence and briefing, and the court's consideration of the legal standards that apply to the issues raised, it determines that Defendant's Motion to Suppress should be denied.

A.  **Search of Defendant's Pants Pockets and Seizure of Evidence**

Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted)); *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002) (explaining that, under the Fourth Amendment, "[w]arrantless searches and seizures are 'per se unreasonable unless they fall within a few narrowly defined exceptions.'") (quoting *United States v. Roberts*, 274 F.3d 1007, 1011 (5th Cir. 2001)). One exception "to the warrant requirement is a search incident to a lawful arrest." *Gant*, 556 U.S. at 338 (citation omitted); *United States v. Robinson*, 414 U.S. 218, 224 (1973). "[S]earches that are incident to lawful arrest are those of: the arrestee's person; any items or containers that were located on the arrestee's person at the time of the arrest; and any items or containers that were located within the arrestee's reaching distance at the time of the arrest." *McCullough v. Wright*, 824 F. App'x 281, 286 (5th Cir. 2020) (citing *United States v. Curtis*, 635 F.3d 704, 711-12 (5th Cir. 2011)). The search incident to arrest exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant*, 556 U.S. at 338 (citations omitted). A search conducted incident to arrest is limited to "the arrestee's person and the area 'within his immediate control'" that includes "the area from within which he might gain

possession of a weapon or destructible evidence." *Gant*, 556 U.S. 332 at 339 (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).

It is well established that "law enforcement officials may arrest an individual in a public place without a warrant if they have probable cause to believe that the individual committed a felony." *United States v. Garcia*, 179 F.3d 265, 268 (5th Cir. 1999) (citing *United States v. Watson*, 423 U.S. 411, 423-24 (1976)). "Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Wadley*, 59 F.3d 510, 512 (5th Cir. 1995). "When considering what a 'reasonable person' would have concluded, [courts] take into account the expertise and experience of the law enforcement officials." *Garcia*, 179 F.3d at 268 (citing *United States v. Ortiz*, 422 U.S. 891, 897 (1975)).

Although "the burdens of production and persuasion generally rest upon the movant in a suppression hearing[,] . . . if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). The Government must prove the constitutionality of the arrest by a preponderance of the evidence. *See United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001) ("When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional.").

Neither party disputes that Defendant's arrest and search of his person was done without a warrant. Thus, the Government has the burden of establishing the constitutionality of the search based on its contention that the search of Defendant's person was done incident to his lawful arrest.

To accomplish this, the Government must establish that the arresting police officers had probable cause to arrest Defendant, and that the search complained of by Defendant did not exceed the permissible constitutional limits for searches conducted incident to a lawful arrest.

Together, the facts set forth in the Government's response to Defendant's Motion and the evidence it presented in the evidentiary hearing more than satisfy its burden of showing that law enforcement had probable cause to arrest Defendant and authority to search his person. The Government's evidence establishes that Defendant was quickly apprehended and arrested approximately one hour after the armed robbery of the T-Mobile store, and that his arrest was the result of a coordinated effort by the Grand Prairie and Fort Worth police departments, as well as the Texas Department of Public Safety ("DPS"), which provided helicopter support. Grand Prairie officers, who responded to the armed robbery, obtained information from the T-Mobile employees regarding the robbery; the gun used by the suspect; the physical description of the suspect; and a description of the car (white Scion) and cell phone that the suspect stole from Ms. Garcia. Detective Miles testified that Ms. Garcia told Grand Prairie police officers, within minutes after the robbery, that the suspect was a black male with a goatee and "dreds" or a dreadlock hairstyle, who was wearing a blue shirt, blue jean shorts, blue shoes, and a white hat with a marijuana leaf. She and the other witnesses also advised that the suspect displayed a small black pistol during the robbery.

With this information, which was shared with Fort Worth, Grand Prairie, and DPS officers, law enforcement was able to quickly locate the stolen car using the Find My iPhone feature on Ms. Garcia's cell phone. A Fort Worth officer was the first to locate the stolen Scion. The officer's dash cam video showed the Scion exiting the highway frontage road and coming to a stop in a lot between a motel and restaurant. While observing this, the Fort Worth officer can be heard on the

dash cam video stating that he saw a "black male, blue shirt" abandoning the stolen vehicle and taking off on foot into a wooded area next to the motel. After looking, but not seeing the pistol in the stolen abandoned Scion, the Fort Worth officer reported that the suspect was likely armed. Detective Miles testified that this is the reason that the Fort Worth officer waited for backup to arrive before attempting to apprehend Defendant.

Body cam video of one of the Grand Prairie police officers who arrived at the location a short time later shows several police officers apprehending Mr. Schexnayder near a shed where he was hiding in tall brush. A Grand Prairie police officer can be seen on the video handcuffing Defendant without incident, and patting him down briefly before standing him up and walking him a short distance to a patrol car. It is clear from the officer's body cam video that Mr. Schexnayder is a black male, who was wearing blue jean shorts, and blue shoes. He had removed his bright blue shirt, but it was attached to the back of his head or back when he was apprehended.

Detective Miles also testified that officers found a white hat with a marijuana leaf nearby that matched the description of the hat worn by the suspect during the commission of the robbery. Before being placed in the patrol car, the body cam video shows officers searching Defendant's pants pockets, removing all items from his pants pockets and placing them in a bag, and confirming that he was not armed. Detective Miles testified that a canine unit with experience in locating firearms was brought in to assist with the search of the pistol. He further testified that a pistol matching the description of the one used in the robbery was located several hours after Defendant's arrest in a woodpile near the shed where he was found hiding.

During the suppression hearing, Defendant took issue with the T-Mobile employee witnesses' description of his hairstyle as "dreds" or dreadlocks. In the body cam video of Defendant's arrest, Defendant's hair appears to be styled in twists that are above the shoulder in

length rather than dreadlocks as reported by the witnesses, but the witnesses' use of imprecise terminology in describing his hairstyle is insufficient to detract from the overwhelming evidence that provided law enforcement with probable cause to arrest him. In all other respects, Defendant matched the physical description of the robbery suspect reported by T-Mobile employees who witnessed the robbery, including Ms. Garcia, who came in close contact with the suspect during the robbery. A person matching Mr. Schexnayder's description—"black male, blue shirt"—was also observed by the Fort Worth officer less than one hour after the robbery abandoning Ms. Garcia's stolen car and taking off on foot, and he was found a short time later hiding nearby.

Thus, considering the totality of circumstances and the collective knowledge of law enforcement officers who participated in investigating the armed robbery and apprehending the suspect of the armed robbery, police officers had sufficient information at the time of Mr. Schexnayder's arrest to conclude that he was the person who committed the armed robbery of the T-Mobile store in Grand Prairie. Because police officers had probable cause to arrest Defendant, they were also justified in patting him down and searching his person and pants pockets, particularly in light of information that he used a handgun in robbing the T-Mobile store and employees. The search of Mr. Schexnayder's person and pants pockets that was conducted incident to his arrest was, therefore, lawful in that it was limited to his person and areas where he might be hiding a weapon, including the black pistol used to rob the T-Mobile store.

Defendant also argued during the suppression hearing that the search and seizure of the pistol was improper because of the length of time it took law enforcement to locate the firearm, and the police officers did not secure the area where the firearm was found. He noted that several persons can be seen on the dash cam video milling around where Ms. Garcia's car was abandoned when the Fort Worth police officer first arrived on the scene. From this, he appears to argue that

the firearm that police found under a woodpile by the shed could have been left there by someone else.

This issue was not raised in Defendant's Motion. Regardless, law enforcement's search for and seizure of the firearm does not implicate any Fourth Amendment constitutional concerns. Having abandoned the firearm on property over which he does not and cannot claim a valid privacy interest, Defendant does not have a legal basis for seeking to suppress the firearm. Moreover, as explained by the court during the hearing, whether, as Defendant argues, the firearm located by law enforcement is the same firearm used during the robbery of the T-Mobile store, given the length of time it took police officers to find it and other persons' potential access to the area, would at most go to the weight of the evidence at trial, not its admissibility.

For the reasons stated, Defendant is not entitled to suppression of any evidence based on the foregoing grounds. Mr. Schexnayder's Motion will, therefore, be denied regarding his arrest and search incident to arrest.

### B. Alleged Miranda Violation

The Fifth Amendment protects against compulsory self-incrimination. *Michigan v. Tucker*, 417 U.S. 433, 439 (1974). In *Miranda v. Arizona*, the Supreme Court "extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police." *New York v. Quarles*, 467 U.S. 649, 654 (1984) (citing *Miranda*, 384 U.S. at 460-61, 467). To protect against violations of the Self-Incrimination Clause, *Miranda* established prophylactic rules requiring that any person subjected to custodial interrogation must be given four constitutionally mandated warnings, namely:

> [The person] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479. All four *Miranda* warnings and a waiver of these rights are "prerequisites to the admissibility of any statement made by a defendant." *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) (citing *Miranda*, 384 U.S. at 476). If an officer elicits statements from a suspect in violation of *Miranda*, the statements must generally be suppressed. The prophylactic *Miranda* warnings, however, are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Quarles*, 467 U.S. at 654 (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)). "[A] mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule." *United States v. Patane*, 542 U.S. 630, 641 (2004).

Defendant explained during the suppression hearing that he was seeking to suppress evidence regarding his statements to the police: (1) that "the car is not mine; nobody gave me that car"; (2) that he is not a United States citizen; (3) that the police do not have jurisdiction over him; and (3) that he is standing on his rights. The court listened to the body cam video footage of Defendant's arrest and did not hear any statements by Defendant that were self-incriminating or that would implicate him in the robbery. Defendant admitted as much himself. Moreover, the Supreme Court has explained that "[t]he Fifth Amendment itself does not prohibit all incriminating admissions; '[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.'" *Quarles*, 467 U.S. at 654 (quoting *United States v. Washington*, 431 U.S. 181, 187 (1977)). Here, the Grand Prairie police officer who handcuffed and arrested Defendant did not *Mirandize* him, but he also did not interrogate him. The officer, instead, only asked Defendant for his name, which he would have been entitled to ask under the circumstances, even if Defendant had not been placed under arrest.

Further, while Defendant said something about a car, the statement is indecipherable on the video and was clearly volunteered by him while being handcuffed and escorted to the patrol car without any prompting by the police officers. The police officer who was handcuffing Defendant when he made the statement, instead, simply responded that whatever Defendant said or had to say could wait until he was inside the patrol car in the air conditioning because it was a hot day. Before putting Defendant inside the patrol car, the officers searched and removed items from his pants pockets, and confirmed he was not armed. It was only after this that one police officer asked him for his name, which Defendant refused to provide on the ground that he knew his rights, including his *Miranda* rights. As Defendant's statements were not the product of a custodial interrogation, and the statements made by him were not self-incriminating, *Miranda* does not apply. Similarly, contrary to Defendant's belief, that he was not *Mirandized* by the arresting police officers did not, by itself, violate his constitutional rights or *Miranda* because he was not subjected to a custodial interrogation and did not make any self-incriminating statements. Thus, Defendant's Motion to Suppress statements he made to the arresting police officers for alleged *Miranda* violations will be denied.[2]

**C.     Photo Lineup**

Although not raised in his Motion, Defendant also argued during the suppression hearing that evidence of Ms. Garcia's identifying him from a photo lineup should be suppressed as overly suggestive. The court disagrees.

"The Due Process Clause protects against the use of evidence obtained from impermissibly suggestive identification procedures." *United States v. Guidry*, 406 F.3d 314, 319 (5th Cir. 2005)

---

[2] To the extent Mr. Schexnayder contends that the police officer had no right to ask him his name or date of birth, such contention is without merit. Probable cause, which is more than reasonable suspicion, existed to arrest him. Thus, the officer had a right to question Mr. Schexnayder regarding his identity. *See Brown v. Texas*, 443 U.S. 47, 53 (1979).

(citations omitted). In this circuit, a two-part test is applied in determining the admissibility of an identification. The court must first "determine whether the identification procedure was impermissibly suggestive." *Id.* Next, the court "ask[s] whether the procedure posed a 'very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *United States v. Rogers*, 126 F.3d 655, 658 (5th Cir. 1997)). If the answer to both questions is affirmative, the identification is inadmissible. *Guidry*, 406 F.3d at 319 (citation omitted)). *Id.* If "the procedure was not unnecessarily suggestive," it is not necessary for the court to "consider the second prong of the test, whether there was a 'substantial likelihood of misidentification.'" *Id.* Additionally, "[w]hen a witness identifies the defendant in a police-organized photo lineup, . . . the identification should be suppressed only whe[n] 'the photographic identification procedure was so [unnecessarily] suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012) (citation omitted).

Defendant contends that the photo lineup administered by Agent Satcher was overly suggestive because, out of the six photos used, his photo, the fifth photo, is a "close-up" of his face, whereas the other photos include the shoulders of the other five persons in the lineup. Defendant also takes issue with the admonition form signed by Ms. Garcia because the form does not include detailed information regarding her reasons for identifying him as the person who robbed the T-Mobile store. Finally, Defendant contends that the Government should have been required to have some or all of the other T-Mobile employees who witnessed the robbery, attempt to identify him in a photo lineup.

The court concludes that the photo lineup administered by Agent Satcher to Ms. Garcia was neither impermissibly suggestive nor unreliable. The photo of Defendant is a closer view of his face that the other photos, but not to the extent to make it noticeably different in relation to the

other photos in the lineup. Contrary to his assertion, some of his shoulders are visible in his photo. Additionally, all of the photos in the lineup shown to Ms. Garcia have a blue background and are of black males of approximately the same age and skin tone, except for the fourth photo in which the skin tone of the male is lighter than the rest of the men. All of the men in the photo lineup have similarly styled hair and similar amounts of facial hair. All of the men in the lineup, except for the second photo, are not smiling. There is also no indication from the lineup that Defendant's photo is a "mugshot" or booking photo, whereas the rest are driver's license photos, and Defendant is wearing a white shirt, as is the male in the second photo.

Moreover, Ms. Garcia indicated on the admonition form that her level of certainty in identifying Defendant from the lineup, in her own on words, was a "9." Gov't Ex. 3. Although Ms. Garcia did not make any additional comments in the space provided on the form regarding her identification of Defendant, Agent Satcher testified that, when he presented her with the photo lineup, he asked her to indicate her level of certainty on a scale of one to ten, with "1" being the lowest level of certainty and "10" being the highest level of certainty. Ms. Garcia was shown the photo lineup less than three months after the robbery, and, of the T-Mobile employees who witnessed the robbery, she, as the store manager, had the longest, up-close interaction with Defendant during the robbery. She, therefore, had ample opportunity to view him at that time, and her description of him and the pistol to the police immediately after the robbery was sufficiently detailed, accurate, and consistent with the description provided by other witnesses to the robbery.

Agent Satcher testified that one other T-Mobile employee was unable to identify Defendant from the lineup, and he attempted, but was not able to contact another T-Mobile employee who was a witness to the robbery. This, however, does not make Ms. Garcia's identification any less reliable. The court, therefore, disagrees that suppression of her identification of Mr. Schexnayder

from the photo lineup is warranted under the two-part test applied in this circuit or the legal standard applied by the Supreme Court.

## IV. Conclusion

For the reasons explained, the court **denies** Defendant's Motion to Suppress (Doc. 68) because the evidence establishes that: (1) police officers had probable cause to arrest him and authority to search his person incident to his arrest for armed robbery and vehicular flight; (2) the police officer's search and seizure of the firearm did not violate the Fourth Amendment or Defendant's reasonable expectation to privacy; (3) no *Miranda* violation occurred because there is no evidence Defendant made self-incriminating statements after being taken into custody and arrested; and (3) the photo lineup in this case was not impermissibly suggestive or unreliable.

**It is so ordered** this 11th day of May, 2021.

Sam A. Lindsay
United States District Judge